In the

# United States Court of Appeals
## For the Seventh Circuit

No. 06-2322

ROBERT A. KRIEG and LOCAL NO. 3063
AMERICAN FEDERATION OF STATE,
COUNTY, AND MUNICIPAL EMPLOYEES,

*Plaintiffs-Appellants,*

*v.*

WAYNE SEYBOLD, JACK ANTROBUS,
and CITY OF MARION, INDIANA,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Indiana, Fort Wayne Division.
No. 04 C 430—**William C. Lee**, *Judge.*

ARGUED JANUARY 17, 2007—DECIDED MARCH 21, 2007

Before FLAUM, KANNE, and EVANS, *Circuit Judges.*

FLAUM, *Circuit Judge.* On October 28, 2004, Jack Antrobus, the Superintendent of Marion, Indiana's Streets and Public Works Department administered a random drug test to all employees in the Streets and Sanitation Department. Robert Krieg, a Streets and Sanitation Department employee, refused to be tested, and Antrobus ordered him to leave the building. On November 15, 2004, the City's Board of Public Works voted to termi-nate Krieg's employment. Krieg filed suit arguing that the

drug test violated his Fourth Amendment rights and that the City terminated him without due process. The district court granted summary judgment to the City, and Krieg appeals. For the following reasons, we affirm the district court's judgment.

## I. Background

The City of Marion, Indiana hired Robert Krieg as a driver/laborer in its Streets and Sanitation Department in 1985. During his employment, Krieg was a member of American Federation of State, County and Municipal Employees Local No. 3063 ("the Union").

Prior to 2001, the Streets and Sanitation Department gave its employees prior notice of any drug testing. However, on October 28, 2002, the Union and the City entered into a Collective Bargaining Agreement ("CBA") for 2003-2004, that provided as follows:

> All Streets and Sanitation workers shall comply with the City's Drug and Alcohol Policy. Drug/Alcohol Testing may be conducted on Streets and Sanitation workers post-accident, upon reasonable suspicion or randomly as per the current City policy. A minimum of 50% of the employees shall be tested at least once a year.

The City's Personnel Policies Handbook then in effect provided that the department heads could drug test all "safety-sensitive" employees, defined as "all positions which require an employee to operate a commercial motor vehicle and/or hold a commercial driver's license."

The CBA required all newly-hired employees in the Streets and Sanitation Department to obtain a valid Commercial Drivers License ("CDL") within six months of being hired. However, employees who were hired prior

to September 10, 2000 were exempt from this requirement under a grandfather clause in the agreement.[1] Krieg opted not to obtain a CDL, which prevented him from operating several larger pieces of heavy equipment used by other Streets and Sanitation Department employees. Nevertheless, Krieg still operated a one-ton dump truck, a dump truck with a plow, a front end loader, and a backhoe as part of his regular job duties. He also regularly patched holes in city streets, sealed cracks, plowed snow, loaded salt or sand into City vehicles, and directed traffic. Krieg was never involved in any accidents during his employment.

In December 2002, Krieg submitted to an unannounced drug test that came back positive for marijuana. The Department suspended Krieg for thirty days and required him to undergo drug counseling. Krieg filed a grievance through the Union, arguing that as a non-CDL holder, the City should not have subjected him to urinalysis without probable cause. The City eventually reinstated Krieg after conceding that his testing was improper.

On June 7, 2004, after Wayne Seybold took over as the City's new Mayor, the City unilaterally adopted a new Personnel Policy and Procedures Manual, which provided for random, unannounced drug testing for "[e]mployees in safety-sensitive positions." The manual stated that "a safety sensitive function is any duty related to the safe operation of City equipment during any period in which the City employee is actually performing, ready to perform, or immediately available to perform any safety sensitive functions." The Manual also provided that any employee "who refuses to comply with a request for testing shall be removed from duty and their employment terminated."

---

[1] In January 2000, there were forty employees in the Streets and Sanitation Department, eight of whom did not have CDLs.

The Union filed a grievance and complained that the City did not negotiate with it in implementing the new personnel manual. The Union employees signed documents to indicate that they received the handbook, but specifically withheld their signatures from any language stating that by receiving the handbook they agreed to its terms.

On October 28, 2004, Antrobus informed the Streets and Sanitation Department employees, with the exception of Antrobus's personal secretary, that they would be subjected to a drug test administered that day. Krieg refused to take the drug test. Antrobus warned Krieg that he could be fired for refusing to submit to the urinalysis, but Krieg again refused. Antrobus told Krieg to leave the building because he was no longer employed. Krieg went to a telephone in the building and called his attorney. Antrobus again ordered Krieg to leave the building and threatened to call the police. Antrobus called the police, and Krieg waited for them outside of the building by his car. While they were waiting for the police, Krieg asked Antrobus if he was fired. Krieg testified that Antrobus said yes. Antrobus testified that he said, "I have to take you to the Board of Works. They will make the decision." When the police arrived, they told Krieg to leave the premises, and he left.

The following day, Steve Johnson, the Union steward, filed an official grievance on Krieg's behalf, alleging "disparaging treatment of Robert Krieg and any and all applicable violations of the contract" and requesting reinstatement. Antrobus rejected the request for reinstatement. On November 1, 2004, Darren Reese, the City's Human Resources Director, sent Krieg a letter stating that because Krieg refused to submit to the mandatory drug screen, Reese intended to recommend Krieg's termination to the Board of Public Works ("the Board") at its November 15 meeting.

On November 15, 2004, the Board held its regularly scheduled meeting, which Antrobus and Johnson both attended. At his attorney's advice, Krieg did not attend the meeting. He concedes, however, that he had an opportunity to attend the meeting, present evidence, and have an attorney or a union representative represent him. After hearing statements about the incident, the Board voted to terminate Krieg's employment.

On November 17, 2004, Krieg and the Union filed a complaint in district court under 42 U.S.C. § 1983, alleging violations of the Fourth and Fourteenth Amendments. On December 1, 2005, both parties filed motions for summary judgment. On April 3, 2006, the district court denied Krieg's motion and granted summary judgment in favor of the City. Krieg and the Union now appeal.

## II. DISCUSSION

First, Krieg claims that the City's drug testing policy as applied to non-CDL employees violates the Fourth Amendment. Second, Krieg alleges that he was terminated in violation of his due process rights. This Court reviews de novo the district court's grant of summary judgment to the City. *Employers Mut. Cas. Co. v. Skoutaris*, 453 F.3d 915, 923 (7th Cir. 2006). Summary judgment is proper if the "pleadings, depositions, answer to interrogatories, and admissions on file together with the affidavits, if any, show that there is no genuine issues as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). Because this case involves cross-motions for summary judgment, the Court must construe all inferences in favor of the party against whom the motion was granted. *Employers Mut. Cas. Co.*, 453 F.3d at 923. Accordingly, we review the record in the light most favorable to Krieg, drawing all reasonable inferences from those facts in his favor, and reversing if

we find a genuine issue concerning any fact that might affect the outcome of the case. *Id.*

## A. Waiver

As a preliminary matter, the City contends that Krieg cannot challenge the constitutionality of the drug testing policy because the Union consented to drug testing in the 2003-2004 CBA. The CBA permitted drug testing under "the current policy," which allowed the City to test all "safety sensitive" employees. The policy stated, "In accordance with [Department of Transportation]/[Federal Highway Administration] regulations, included in this classification of safety-sensitive positions are all positions which require an employee to operate a commercial motor vehicle and/or hold a commercial driver's license." Krieg maintains that because he did not possess a CDL and he did not drive "commercial motor vehicles" as defined by federal law, he did not consent to drug testing under the 2003-2004 CBA.

The Federal Omnibus Transportation Employee Testing Act of 1991 defines a "commercial motor vehicle" as a vehicle that:

A) has a gross vehicle weight rating or gross vehicle weight of at least 26,001 pounds, whichever is greater, or a lesser gross vehicle weight rating or gross vehicle weight the Secretary of Transportation prescribes by regulations, but not less than a gross vehicle weight rating of 10,001 pounds;

B) is designed to transport at least 16 passengers including the driver; or

C) is used to transport material found by the Secretary to be hazardous . . . .

49 U.S.C. § 3101(4). The City acknowledges that Krieg did not operate "commercial motor vehicles" as defined above, but contends that the term as used in its drug testing policy was not restricted to the federal definition. The City maintains that "commercial motor vehicle" should be interpreted broadly to encompass the types of vehicles that Krieg regularly operated. We disagree.

Although the CBA does not define the term "commercial motor vehicle," the City's policy clearly refers to federal law in defining safety sensitive positions. The opening clause of the sentence states that the definition of safety sensitive employees, i.e., individuals who operate commercial motor vehicles, must be "in accordance with [Department of Transportation]/[Federal Highway Administration] regulations." This suggests that the Union did not consent to the drug testing of non-CDL holders. In any event, waiver of a constitutional right must be clear and unmistakable, *Chaney v. Suburban Bus. Div. of Regional Transp.*, 52 F.3d 623, 630 (7th Cir. 1995) (waiver will not be assumed by a CBA where it is not explicit), and it is not under these facts.

## B. Fourth Amendment

Krieg challenges the constitutionality of the City's drug testing policy as applied to non-CDL employees. Drug testing is a search within the meaning of the Fourth Amendment because it intrudes upon an individual's expectation of privacy. *Vernonia Sch. Dist. 47J v. Acton*, 515 U.S. 646, 652 (1995). As a general rule, drug testing must be based upon individualized suspicion or wrongdoing to be considered reasonable. *Chandler v. Miller*, 520 U.S. 305, 313 (1997). However, the Supreme Court has held that random drug testing is constitutionally permissible when it "serves special governmental needs . . . ." *Nat'l Treasury Employees Union v. Von Raab*, 489 U.S. 656, 665

(1989). The Court has explained that when such a special need exists, courts should "balance the individual's privacy expectations against the government's interests to determine whether it is impractical to require a warrant or some level of individualized suspicion in the particular context." *Id.*

### 1. Special Need

The Supreme Court has held that a special need exists when the government employee subjected to random drug testing holds a "safety sensitive" position. *Skinner*, 489 U.S. at 630. To determine whether an employee occupies a safety sensitive position, courts must inquire whether the employee's duties were "fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Id.* at 628.

Courts have widely permitted random drug testing of public employees who work with large, mobile equipment. Random drug testing is permitted in the aviation industry, including testing of air traffic controllers, aircraft maintenance personnel, flight crew members, and flight attendants. *See, e.g.*, *Bluestein v. Dept. of Transp.*, 908 F.2d 451, 457 (9th Cir. 1990). Courts have also upheld random drug testing for employees in the rail, highway, and water transportation industries; including railroad safety inspectors, highway and motor carrier safety specialists, and lock and dam operators. *See, e.g.*, *Am. Fed'n of Gov't Employees v. Skinner*, 885 F.2d 884, 892 (D.C. Cir. 1989). A number of courts have also upheld drug testing of heavy equipment operators, such as forklift operators, tractor operators, engineering operators and crane operators because of the threat to other persons in the area. *See, e.g.*, *Am. Fed. of Gov't Employees v. Cheney*, No. C-88-3823-DLJ, 1992 WL 403388 *13 (N.D. Cal. Aug. 14, 1992); *Plane v. United States*, 796 F. Supp. 1070, 1075-77 (W.D. Mich.

1992); *Middlebrooks v. Wayne County*, 521 N.W.2d 774, 779 (Mich. 1994).

At the same time, courts have recognized an outer limit on the nature of the safety threat that justifies random drug testing. *See e.g.*, *Burka v. N.Y. City Transit Auth.*, 751 F. Supp. 441, 443-44 (S.D.N.Y. 1990) (holding that elevator operators, carpenters, masons, plumbers, sign painters, and power distribution maintainers are not in safety sensitive positions); *Nat'l Treasury Employees Union v. Watkins*, 722 F. Supp. 766, 770 (D. D.C. 1989) (granting a preliminary injunction against random drug testing of Department of Energy employees whose job duties included driving cars and vans with documents); *Nat'l Treasury Employees Union v. Lyng*, 706 F. Supp. 934, 947 (D.D.C. 1988) (granting a preliminary injunction to Department of Agriculture employees who drove a daily shuttle bus, a mail van, and passenger cars).

After reviewing the record, we hold that Krieg performed a safety sensitive job. Krieg testified that he regularly operated a one-ton dump truck, a dump truck with a plow, a front end loader, and a backhoe. These large vehicles and equipment present a substantial risk of injury to others if operated by an employee under the influence of drugs or alcohol. Moreover, they are significantly larger and more difficult to operate than the vans or passenger cars operated by the plaintiffs in either *Watkins* or *Lyng*. Additionally, Krieg did not operate these vehicles in rural areas away from traffic and pedestrians. Rather, he operated them in the City near other vehicles and pedestrians. Consequently, any reasonable jury would conclude that Krieg's job duties were "fraught with such risks of injury to others that even a momentary lapse of attention [could] have disastrous consequences." *Skinner*, 489 U.S. at 628.

### 2. Balancing Test

After we determine that a special need exists, the Court engages in a balancing test between the "intrusion on the individual's Fourth Amendment interests" and the search's "promotion of legitimate governmental interest." *Vernonia*, 515 U.S. at 653. This Court considers the following factors: 1) the nature of the privacy interest upon which the search intrudes, 2) the character of the intrusion on the individuals' privacy interest, 3) the nature and immediacy of the governmental concern at issue, and 4) the efficacy of the particular means used to address the problem. *Joy v. Penn-Harris-Madison Sch. Corp.*, 212 F.3d 1052, 1059 (7th Cir. 2000).

Under the first factor, the Court must consider the nature of Krieg's privacy interest. Krieg argues that he did not have a diminished expectation of privacy because he chose not to obtain a CDL. Courts have held, however, that employees subjected to drug testing in the past have a diminished expectation of privacy. *See, e.g.*, *Int'l Bhd. of Teamsters v. Dept. of Transp.*, 932 F.2d 1292, 1302 (9th Cir. 1991). Neither party disputes the fact that Krieg had previously submitted to drug testing throughout his employment with the Department. Indeed, he tested positive for marijuana in December 2002. Accordingly, Krieg had a diminished expectation of privacy.

The second factor requires the Court to assess the character of the intrusion on Krieg's privacy. Krieg asserts that the intrusion was severe because although the City set forth specific testing requirements, Antrobus did not follow those procedures. The City's policy provided that random, suspicionless drug testing would be "spread throughout the year" and that the City would utilize a "scientifically valid method" for selecting employees to be tested to "ensure that each covered employee will have an equal chance of being selected each time selections

are made." Krieg contends that testing every employee in the Streets and Sanitation Department violated the policy. Despite Krieg's protestations, Antrobus did follow the City's policy. The drug test was random because Antrobus chose a random date on which to administer it, and everyone in the department had the same likelihood of being selected for testing.

Krieg concedes that the City has a compelling interest in ensuring that its employees who regularly drive large equipment around the City are not impaired by drugs or alcohol. However, he argues that the government's concern is not immediate because the City did not establish a history of drug-related accidents by non-CDL holders. However, the Supreme Court "has not required a particularized or pervasive drug problem before allowing the government to conduct suspicionless drug testing." *Bd. of Ed of Ind. Sch. Dist. No. 92 v. Earls*, 536 U.S. 822, 835 (2002).

Finally, as to the efficacy of the means, Krieg maintains that in the absence of a history of drug-related accidents, the City was required to demonstrate that it could not address the problem by observing Department employees for suspicious behavior. Although *Von Raab* noted the difficulty of subjecting customs officials to day-to-day scrutiny, neither the Supreme Court nor this Court has ever held that this showing is a requirement of imposing random drug tests. 489 U.S. at 674.

After balancing the applicable factors, we conclude that the City has shown a governmental interest sufficient to justify submitting Krieg to random, suspicionless drug testing.

### B.  Due Process

Krieg next contends that the City deprived him of his job without due process of law. A plaintiff alleging a due

process violation must demonstrate 1) that he had a property interest and 2) that he was deprived of this interest without due process of law. *Bishop v. Wood*, 426 U.S. 341, 343 (1976). Krieg bears the burden of proving that he had a property interest in his job arising out of a state statute, state or municipal regulations, or a contract with a public entity. *Ulichny v. Merton Cmty. Sch. Dist.*, 249 F.3d 686, 700 (7th Cir. 2001). Krieg argues that the CBA provided him with a property interest in his job for 2003-2004.

The Supreme Court, the Seventh Circuit, and Indiana courts have all held that a collective bargaining agreement does not create an employment contract except in rare cases. *See J.I. Case Co. v. NLRB*, 321 U.S. 332, 334-35 (1944) (holding that the result of a collective bargaining agreement is not "a contract of employment except in rare cases; no one has a job by reason of it and no obligation to any individual ordinarily comes into existence from it alone"); *Young v. N. Drury Lane Prods., Inc.*, 80 F.3d 203, 206 (7th Cir. 1996) (stating that "a labor agreement is not a contract of employment; employees are hired separately and individually"); *Ritter v. Stanton*, 745 N.E.2d 828, 841 (Ind. Ct. App. 2001) (stating that "although collective bargaining agreements can be considered contracts relating to employment, they do not necessarily create a 'contract of employment' within the strict meaning of the term"). Accordingly, without some specific promise of employment, the CBA did not provide Krieg with a property interest.

Krieg maintains that the CBA's just cause provision gave him a property interest. The clause is located in the section that governs seniority and states, "The seniority of an employee shall terminate . . . [w]hen he/she is discharged for just cause." That provision does not state that employees may be discharged only for just cause. Rather, it merely indicates that those employees dis-

charged for just cause lose their seniority. Because there is no clause stating that employees may be discharged only for just cause, Krieg was an at-will employee who did not have a property interest in his job. The district court correctly granted summary judgment in the City's favor.

### III. CONCLUSION

For the above stated reasons, we AFFIRM the district court's judgment.

A true Copy:

Teste:

_____
*Clerk of the United States Court of*
*Appeals for the Seventh Circuit*